IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 3:09-cv-0887 |
| SOUTHEAST TELECOM, INC., | ) ) | Judge Thomas A. Wiseman, Jr. |
| Defendant. | ) ) | |

<u>MEMORANDUM OPINION</u>

Plaintiff Equal Employment Opportunity Commission ("EEOC") brings this action on behalf of Suzanne Sword alleging that defendant Southeast Telecom, Inc. ("SET") discharged Sword in retaliation for her complaint of sex discrimination, in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), and of the Fair Labor Standards Act ("FLSA"). SET has now filed its motion for summary judgment (Doc. No. 14), asserting that Sword's claims[1] must fail because Sword lacked a reasonable, good-faith belief that a Title VII violation had occurred in the first place and because Sword can neither establish a *prima facie* case of retaliation or show that SET's proffered good-faith, non-retaliatory reasons for its actions are pretextual. As explained herein, the Court finds that Sword has presented evidence sufficient to state a *prima facie* case of retaliation, and to create an inference that SET's proffered reasons for its adverse actions against Sword are pretextual. Consequently, SET's motion for summary judgment will be denied.

I. STANDARD OF REVIEW

In reviewing a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure 56, this Court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for

---

[1] Although the EEOC is technically the plaintiff in this action, the Court will refer to the claims as though brought directly by Sword herself.

summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–48.

To avoid usurping the role of the factfinder, the Court must accept as true the non-moving party's evidence and construe all justifiable inferences that may be drawn therefrom in favor of the non-movant. *Id.* at 255. However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," summary judgment must be granted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## II.    FACTUAL BACKGROUND

SET sells and distributes telecommunications equipment to businesses, and provides continuing technical support to those businesses. SET is an at-will employer located in Nashville, Tennessee. SET's Nashville office at the time relevant to this lawsuit was located at 500 Royal Parkway, just a few minutes off of Interstate 40. SET's sales department is composed of account executives and sales engineers, overseen by a sales manager. Sales engineers assist the account executives with the technical aspects of customers' requests and otherwise help support the sales team. Sales engineers often accompany account executives on client calls and assist in presentations to clients. Account executives—also referred to as sales representatives—interact with clients directly, selling SET's products and services.

Suzanne Sword was hired as an account executive, or sales representative, for SET on February 12, 2007. Although she had no prior expertise in the telecommunications arena, she was an experienced saleswoman. Sword was hired as a "hunter," and her expertise lay in finding new clients. Her performance for SET was satisfactory, and prior to the events giving rise to this lawsuit she won a sales contest at SET and was awarded a top client as a result. As an account executive focused on obtaining new business for SET, Sword did a lot of "cold calling" and attended a lot of networking business. (Sword Dep. 33:24–34:5.)

According to Sword, neither her initial sales manager, Greg Floyd, nor Floyd's successor, Chris Baugher, expressed an expectation to her that she should spend a substantial amount of time in SET's offices. Rather, Sword was told that unless she was doing a proposal or using the telephone for cold-calling, office time was time that could be better spent on sales and "finding new leads." (Sword Dep. 34:14–18.) However, Sword acknowledged that Floyd expected the sales representatives to be in the

office at 8:00 a.m. unless they had a networking meeting or were going on a cold call, in which case "it didn't make sense for [the sales representatives] to come in and then leave." (Sword Dep. 36:1–4.) In addition, Sword and the other sales representatives were expected to come into the office for various meetings with the sales manager and with sales engineers and for training, and to pick up and drop off contracts and other documents. (Sword Dep. 34:19–37.) Sword was expected to attend regular, weekly, one-on-one meetings with Chris Baugher after he became her sales manager, but she believes she had only one such meeting with him during the two-week period that he functioned as her manager. Although Sword claims she never discussed the matter with him after Baugher became sales manager, Sword continued her practice of being in the office at 8:00 a.m. unless she notified Baugher that she had an early appointment or meeting out of the office. (Sword Dep. 42:16–23.) Sword also conceded that the employee handbook, which Sword received and read, states that sales representatives are to schedule administrative time in the office. According to Chris Baugher, account executives were required to notify him daily of what their plans were for that day. (C. Baugher Dep. 30:19–20.) Sword denies that this requirement was communicated to her, but testified that she kept Baugher apprised of her plans.

When it came to making actual sales calls, Sword testified that she would generally make the initial call by herself. She would then take whatever information she obtained from the potential customer at that meeting back to the office and confer with a network engineer (Sword Dep. 28:21–29:9.) She would then schedule a follow-up appointment with the potential client to present a product or proposal. The network engineer might accompany Sword on this follow-up meeting, but not necessarily. Generally, if she was unsure about any technical aspects of the products or proposal she was presenting, she would ask either Danny Allen or, more typically (after Allen became a sales representative), Jeanine Green to accompany her. (Sword Dep. 29:13–30:12.) According to Chris Baugher, the learning curve with respect to the technical aspects of the business is "quite steep." (C. Baugher Dep. 40:5–8.)

SET had five or six sales representatives in Nashville at the time Sword was hired. All of them left the company over the course of the first few months of her employment, except for Sword and Danny Allen, who moved from being a sales engineer to a sales representative around April 2007. Allen was a five-year veteran of SET. In the position of sales engineer he had provided technical support to sales representatives, and he had eighteen years of experience in the telecommunications industry.

According to SET, the company expects "large, enterprise-level accounts" to be handled by someone with experience with network issues (L. Baugher Dep. 48:3–5), and the only sales representative with the necessary knowledge and experience, after all the others but Sword and Allen had left, was Allen. (L. Baugher Dep. 49:3–5.) Sword points out, however, that Chris Baugher himself described the St. Thomas Medical Group account as a "large, important, installed-base customer" that needed a sales representative assigned to it, and he assigned the account to Sword. (C. Baugher Dep. 65:21–66:4.) In addition, Sword won a sales contest under her former sales manager, Greg Floyd, the prize for which was the assignment of a large account worth over $100,000, irrespective of her lack of technological experience.

Chris Baugher arrived in Nashville as the new sales manager (replacing Greg Floyd) on June 18, 2007. Sword decided to approach Baugher with a formal written complaint that the accounts of former sales representatives were being assigned on a discriminatory basis, mostly to Allen, on Friday, June 29, 2007. On the morning of Friday, June 29, 2007, Sword had a meeting with Chris Baugher during which she first expressed her concerns to him. According to Chris Baugher, Sword expressed that she was unhappy with the way she was being treated, and she thought she was being discriminated against on the basis of her gender, and she wanted "rock-solid justification" for why accounts had been reassigned the way they had over the last two months. (C. Baugher Dep. 56:1–13.) Baugher told her the five accounts that had been reassigned in the two weeks since he had arrived had been assigned to Allen because of "the size of the account and the technical expertise it would take to maintain those accounts." (C. Baugher Dep. 56:14–22.) Baugher claims he also told Sword that SET did "not tolerate any form of discrimination whatsoever," and that he would get Melissa Lambert, SET's human resources manager, involved and that Sword's concerns would "be handled and taken seriously." (C. Baugher Dep. 56:23–57:2.) According to Baugher, he told Sword at that point in the meeting that he would "be right back," and left Sword in his office to step into Lambert's office to give her notice about Sword's complaint. When he returned to his office moments later, Sword was no longer there.

Sword's account of this meeting differs. According to Sword, she expressed concern that accounts were being assigned discriminatorily, and she handed Baugher her letter detailing her complaint. Sword also testified that during her meeting with Chris Baugher, she told him she thought SET

was a "good ol' boys club," made up of long-term SET employees like John Haley, Larry Baugher, Betty Jo Wolfe, Jeanine Green, and Danny Allen who were "left over after all the terminations." (Sword Dep. 82:15–83:11.) Baugher read her letter and told her he "would look into it, and he would get with Melissa and that he would get back to [Sword]." (Sword Dep. 86:13–15.) Sword then left his office and began work. She first went back to her cubicle, which was right beside Chris Baugher's office, and then proceeded to work on whatever was on her calendar that day.

According to Melissa Lambert, SET's human resources manager, Chris Baugher talked to her about Sword's concerns at some point that morning. She asked Baugher to "type up what they had discussed" and send it to her via email. Immediately after Baugher left her office, Lambert called Sword on her office phone and left her a message asking that she call her back. (Lambert Dep. 40:1–13.)

What happened subsequently is also subject to some dispute. Sword contends that after she left Baugher's office, she gathered her laptop and the active files she was working on from her nearby cubicle, and left the office to make her usual round of sales calls and cold calls. She maintains she was not aware that she was scheduled to attend a meeting at St. Thomas Medical Center at 10:00 that morning. She concedes that, as sales manager, Chris Baugher had access to her Microsoft Outlook appointment calendar. Baugher testified that he sent an appointment invitation to Sword via Microsoft Outlook on Tuesday, June 26, 2007 at 3:50 p.m., inviting her to attend a sales meeting with St. Thomas Medical Group on Friday, June 29, 2007 at 10:00 a.m. (C. Baugher Dep. 64:8–20.) The meeting came about because the customer called Baugher to request a meeting. (C. Baugher Dep. 64:21–25.) Baugher's message to Sword indicated that this could be a great opportunity because the customer, St. Thomas Medical Group, already had service with SET. The account was being transitioned to Sword because the previous account executive was no longer with the company. (C. Baugher Dep. 65:15–25.) Baugher also sent the appointment invitation to sales engineer Jeanine Green. The documentation indicates that Sword sent a response accepting the invitation at 10:05 p.m. that night. Baugher could not say whether it was unusual for Sword to send a response that late at night, because he had only been working with her for just over a week by that time, though he agreed it would be unusual for anyone to send him an email that late. (Baugher Dep. 66:14–67:5.) Baugher never actually spoke to Sword about this meeting until after he discovered she failed to attend it. In other words, though Sword complained to

him in their earlier meeting that all five accounts that had been reassigned since Baugher began working had all been assigned to Allen, he did not mention that he was assigning the St. Thomas account to her.

Jeanine Green could not remember how she learned about St. Thomas meeting. She testified that normally the sales representative on an account would let her know there was an appointment scheduled for a certain date, and she would either put it on her calendar herself manually, or by accepting an appointment invitation through Microsoft Outlook. She did recall that she was supposed to go with Sword to the meeting. When Sword never came to get her to go to the meeting, Green assumed Sword had gone to the appointment by herself. Green also testified that she overheard Baugher on a telephone call responding to what sounded like a question about whether the sales representative was coming. (Green Dep. 19–25.) When she heard Baugher's phone call, she immediately went to Baugher and told him that she had been supposed to go to the meeting with Sword, but Sword had never come by to get her. Green also testified that she called and left Sword one or two voicemail messages that day just asking her to "touch base" with her since she had not heard from her. (Green Dep. 28:25–29:16.)

Sword testified that she did not recall ever seeing the St. Thomas appointment on her calendar, and that Baugher never mentioned it during their 8:00 a.m. meeting the same morning. She also testified that she would have been in the office the day Baugher supposedly sent the meeting invitation, because she had a three-hour meeting in the office that afternoon. She believes that if the invitation was actually sent, she would have seen it before she went home for the day since it was supposedly sent at 3:50 p.m. (Sword Dep. 104:8–19.) According to Sword, there was nothing on her calendar for that Friday except a doctor's appointment at 3:00. Her plan for the day was to follow up on some leads she had received and to make cold calls on those leads, and she was "certain" she had told Baugher that. (Sword Dep. 100:2–23.) She did recall receiving a phone message from Green, but claimed that Green was trying to reach her about a non-business-related matter. (Sword Dep. 110:5–9.) She also recalled speaking to Melissa Lambert that day but could not recall when, and it does not appear they discussed the missed meeting. She did not dispute Lambert's recollection that they spoke on the phone around 5:10 p.m., and that Melissa wanted to meet with her on Monday to discuss the letter Sword had given to Baugher outlining her concerns about discrimination. (Sword Dep. 120:15–121:13.)

In any event, while there seems to be a dispute as to whether she was ever actually notified

about the details concerning the meeting, there is no dispute that Sword missed the meeting at St. Thomas.  Baugher testified that he received a telephone call from the contact at St. Thomas around 10:45 that morning, asking why no one had shown up for the scheduled appointment.  Baugher claimed that after he received the phone call from St. Thomas, he reported it to Lambert.  Lambert requested that he record the incident in writing, so he sent an email memo to Lambert documenting the incident.

According to Lambert, Baugher came to her around lunchtime to tell her Sword had missed the St. Thomas meeting.  Lambert recalled that they discussed the matter with SET's "leadership team," which consists of Larry Baugher, Betty Jo Wolfe, and Wayne Kirby, though Lambert was not sure whether Kirby actually participated in this conversation.  (Lambert Dep. 42:18–19, 44:1–3.)  Lambert recalled that she went either to Larry Baugher's or Wolfe's office to speak with them about the incident.  According to Lambert, Chris Baugher expressed his concern that Sword had missed a meeting and he did not know exactly where Sword was, and the discussion ended when Lambert recommended that SET suspend Sword's network access if they were not able to contact her by the end of the day.  (Lambert Dep. 44:10–50:9)  Chris Baugher, however, did not recall discussing the missed meeting with anyone other than Lambert and Green.  (C. Baugher Dep. 76:25–77:6.)  In addition, he affirmatively stated that Lambert unilaterally made the decision to disable Sword's access to the company's computer network.  (C. Baugher Dep. 80: 8–11 ("Q.  [W]ithout any input from you, Melissa Lambert independently cut off Suzanne Sword's computer access. Is that your testimony?  A.  Yes.").)

Despite Baugher's alleged concern that he did not know where Sword was that Friday, he claims he did not immediately try to call her about the missed appointment because he "thought it was important that [Lambert] address Suzanne Sword's complaint about discrimination."  (C. Baugher Dep. 95:9–11.)  He testified that he spoke with Sword about it at some point, either the same Friday or the following Monday,[2] and asked her "what's going on, you missed an appointment with St. Thomas Medical Group."  (C. Baugher Dep. 76:9–11.)  Sword responded that she was "out doing her job" and "didn't know she had an appointment with St. Thomas Medical Group."  (C. Baugher Dep. 76:12–16.)  He told her the appointment was on her calendar, and she said she did not think it was on her calendar.  (C. Baugher Dep. 76:16–18.)

_____

[2] Sword denies that she spoke with Baugher about the missed meeting on Friday.

Moreover, although there is no dispute that Sword returned Lambert's call(s) by the end of the day, Lambert did not put a halt to the plan to suspend Sword's network access, password, and access to the building.  According to SET, the company made the decision to suspend Sword's network access and disable her key fob over the weekend in order to protect its intellectual property, which it claims was a common practice in the industry.  Specifically, Lambert waited until 4:30, the end of her workday, before asking Patrick Lafferty in SET's IT department to disable Sword's network and email access, and asked Wayne Kirby to disable her key fob.  She believed she received confirmation from Kirby around the same time that he had disabled Sword's key fob.  (Lambert Dep. 58:14–18.)  In addition, Chris Baugher had Sword's office telephone calls rolled over to his line around midday in case any customers called with questions while Sword was absent.  He testified he had never done this before unless the employee "was either out on some type of leave, or they were no longer with the company."  (C. Baugher Dep. 87:18–20.)

When Sword and Lambert spoke on the phone around 5:00 p.m. that Friday, Sword related to Lambert that she was concerned about the way accounts were being assigned, and provided some details regarding that concern, and also reported that some commissions due to her had not been paid.  (Lambert Dep. 50:13–25.)  Lambert did not mention or ask about the missed meeting at St. Thomas, though she clearly knew about it, nor did she quiz Sword about her day's activities.  Rather, Lambert and Sword agreed to meet first thing Monday morning, at 8:00 a.m., to further discuss Sword's concerns about the discriminatory distribution of accounts.  Lambert did not inform Sword during their conversation that Sword's network, telephone, and building access had been suspended.  According to Lambert, Sword "seemed like she was okay" on the phone, and Lambert's plan was "to go back in early on Monday and restore everything so [Sword] would have no knowledge of it, so she would not . . . be upset about it." (Lambert Dep. 54:17–21.)  That plan failed, as discussed below.

According to Larry Baugher, someone in the office pointed out at some point during the day on Friday that it looked as if Sword had "taken stuff off of her work station, which [was] fairly odd."  (L. Baugher Dep. 56:2–6.)  In addition, his conversation with Melissa Lambert gave him the impression that they "could possibly have a problem" with Sword, that she "could've left, quit, gone with the competitor." L. Baugher Dep. 56:23–57:4.)  As a consequence, Baugher authorized Lambert and Patrick Lafferty to

"do what we normally do" if they felt the company's intellectual property was "in any sort of jeopardy." (L. Baugher Dep. 57:4–7.)

SET claims it had previously experienced problems with account executives using information to contact its customers for other providers (L. Baugher Dep. 57:8–58:2), and that this was the reason for suggesting extra caution in Sword's case. (Lambert Dep. 47:19–48:10.) Sword points out, however, that according to the Complaint filed by SET against the referenced former employee, Scott Lattimore, SET did not become aware of any purported violations of its rights by Lattimore until the "fall of 2007," well after the events giving rise to Sword's lawsuit. (*See* Doc. No. 24–19, at ¶ 10, Complaint filed in case of *Southeastern Telecom, Inc. v. Lattimore*, 08-222-IV (Ch. Ct. Davidson Cnty., Tenn. Jan. 29, 2008).)

In its statement of undisputed facts, SET asserts that it would have taken the same course of action for any account executive who had missed a sales call and was not in communication with the office, that suspending her network access "had nothing to do with Sword's complaint about gender bias." (SET Statement Undisp. Facts, Doc. No. 18, at ¶ 36.) SET's citations to the record do not actually support that assertion, however. In addition, Sword points out that SET had never suspended network access to any *active* employee before suspending Sword's access. Rather, it had previously denied access to employees whose employment had already terminated. (Lambert Dep. 59:19–22; L. Baugher Dep. 58:1–2 ("[A]nytime somebody resigned we turned everything off. . . ."), 64:10–65:13.) In addition, to Larry Baugher's knowledge, Suzanne Sword was the only sales representative to make a complaint of sex discrimination in the assignment of accounts. (L. Baugher Dep. 65:14–21.)

Sword testified that she tried to check email during the day on Friday and discovered that access to her work email was denied. She assumed there was a "glitch in the system, and that happened quite often," so she was not concerned and did not call anyone to complain about the lack of access. (Sword Dep. 124:8–9.) She still was unable to get access when she tried again later in the day, but again did not find that to be unusual. Although Sword is apparently attempting to raise an inference that her network access was cut off during the day, and not after 5:00 p.m., she concedes that she frequently had problems logging in long-distance. Patrick Lafferty, SET's IT director, claims he did not disable Sword's access to her account until about 5:30 p.m. on Friday. (Lafferty Dep. 40, 51.) Sword testified that she did not normally work on weekends, but there is some indication in the record that she attempted to log into

SET's network over that weekend, as discussed below. In any event, it is undisputed that she did not contact SET's IT employees about her access over the weekend. However, Sword claims she learned at some point on that Friday that she could not access her office voicemail.

Sword apparently arrived at SET's offices to meet with Lambert before 8:00 a.m. on Monday morning, July 2, 2007, and was "taken aback" at finding that her key fob did not work and she was unable to enter the building. (Sword Dep. 131:4.) She called Lambert to meet her at the door to let her in. By that time, she also knew her computer still was not working and she was unable to access her voicemail. (Sword Dep. 131:9–11.) Consequently, the first thing she discussed with Lambert was these issues; Lambert at first told her that everyone was having issues. Eventually Lambert told her the truth, and Sword asked why the company had felt it necessary to cut off her access. According to Sword, Lambert told her the company was "afraid of what [Sword] would do with the information." (Sword Dep. 136:13–14.) Lambert claims she told Sword that the company had shut off Sword's access because they "did not know where she was on Friday and no one was able to reach her." (Lambert Dep. 82:12–16.) Lambert assured her her email access and building access were or would be restored, but Lambert was vague about the details regarding what was required to effectuate those promises. It is entirely unclear from the record whether Sword's access to her email account was restored at any point that morning.[3]

In any event, according to Lambert, Sword, in response to Lambert's explanation, expressed that she felt embarrassed. "She felt like everyone knew everything that was going on and she wanted to work from home that day." (Lambert Dep. 84:7–9.) Lambert told her they would need to run that request by Chris Baugher, but, according to Lambert, Sword stated she did not have time, that she had a meeting and she needed to leave immediately, which she did. (Lambert Dep. 85:8–18.) Lambert claims she

---

[3] According to Patrick Lafferty, Lambert sent him an email at 6:39 a.m. requesting that he restore Sword's access to the network. (Lafferty Dep. 35:14–23, & Ex. 2.) Lafferty did not recall what time he received and opened this email, but testified that he normally arrives at work at 7:30. He stated that he believes he would have restored email access to Sword "[b]y writing a password," handing it to Lambert, which Lambert would then have passed on to Sword. (Lafferty Dep. 36:1–14.) Lafferty further testified that, because he had been made aware that Sword had allegedly removed personal items from her desk before leaving on Friday, and because he knew her network access had been removed over the weekend, he took it upon himself to monitor Sword's email activity that morning. According to Lafferty, he became aware at some point between 7:30 and 9:30 that morning of "wholesale" deletion of emails from Sword's inbox. (Lafferty Dep. 53:22.) He reported that finding to Lambert, who at some point later that same morning gave Lafferty a second instruction to disable Sword's email access. According to Sword, however, she never regained access to her work email after approximately noon on Friday, June 29, 2007. She specifically denied deleting emails from her inbox on Monday, July 2.

became concerned about Sword's behavior, in that she refused to talk with her manager, and she had taken customer files and "all her personal effects from her desk, her cubicle," and had then left abruptly. (Lambert Dep. 95:10–14.)  She discussed this concern with Larry Baugher, who, according to Lambert, was concerned about confidential information.  They decided they "didn't want [Sword] working . . . [i]f she was that upset."  (Lambert Dep. 95:20–22.)  They decided at that point to "offer" Sword a "couple of days off to kind of think about the situation, calm down a little bit and then come back into the office after the holiday."  (Lambert Dep. 95:24–96:4.)  Lambert called Sword to convey this decision to her.  Lambert claims she discussed with Sword what the company's concerns were, and noted specifically, "I think I did mention that we noticed that she had taken all of her personal things."  (Lambert Dep. 97:20–22.)  Lambert also claims Sword was "irate" and "still upset" in response to the company's suggestion that she take two days off instead of simply working from home.  (Lambert Dep. 97:14–15.)

Sword's version of her meeting with Lambert differs from Lambert's, of course.  According to Sword, she felt "uncomfortable" and "uneasy" about the situation because she "had no idea why it was going on."  (Sword Dep. 141:18, 23–24.)  She told Lambert during their meeting that she would prefer to work from home until the issues were resolved.  At that point, according to Sword, Lambert had not assured her that her access had been or would be restored.  Lambert told her she would need to talk to Chris Baugher about that; she left her office to go speak with Chris, and Sword waited until Lambert returned.  When Lambert returned, she told Sword that Baugher had approved her working from her home office.  Sword testified that after that, she "went to work."  (Sword Dep. 140:19.)  About an hour later, however, Sword received a phone call from Lambert telling her the company "thought it was best for [Sword] not to call on clients Monday and Tuesday and that [she] needed to take those days off."  (Sword Dep. 141:1–3.)  Sword testified that she told Lambert she was not upset, that she was fine to work, but that she had simply brought up a concern and she wanted the concern resolved.  She also averred that she took with her on Monday only a couple of files that she was actively working on, and denied that she took any personal effects with her.  (Sword Dep. 165:6–15.)  She also testified that Chris Baugher knew her plans when she left because he would have been able to access her Outlook calendar.

In an email sent to Melissa Lambert at 4:14 p.m. on Monday, July 2, 2007, Sword essentially summarized her version of what had occurred during her meeting with Lambert that morning, and

reiterated her concern about not having been able to enter the office building with her access key when she arrived that morning and about not having had access to her work email since sometime on Friday. The email clearly expresses Sword's belief that the company's actions were in response to her having made a complaint of discrimination:

> After meeting with you this morning, you told me that the company agreed to allow me to work from my home office because of the hostile work environment that now exists due to my previously stated concerns. I gathered my files and my computer and intended on continuing my work day. Approximately one hour later, I received a call from you stating that the company had requested that I take Monday, July 2nd and Tuesday, July 3rd and Wednesday, July4th (holiday) off and return to work on Thursday, July 5th. As I stated to you, I had already previously scheduled appointments and you suggested that I reschedule them to accommodate your request. You also stated that you needed a list of accounts that are in question.
>
> It is very unfortunate that an employee concern cannot be discussed and a solution arrived upon in a timely manner without asking me to discontinue working. You stated that this was being asked because I was too upset about the situation. I am in fact not upset, but rather very disappointed in the manner in which Southeastern Telecom has handled an employee concern.
>
> As you requested, I have attached a copy of the accounts in question.
>
> I will expect to hear from you by Tuesday, July 3rd at the close of business.

(*Id.*)

Lambert responded with an email stamped 5:11 p.m. stating she disagreed with Sword's version of the events of that morning and requested that Sword call her if she wanted to discuss the matter further. She asked Sword to confirm their plan to meet upon Sword's return to the office on Thursday morning, and she also indicated she would begin her investigation into the assignment of the accounts Sword was concerned about. Sword responded the same evening by reiterating that she needed Lambert to put in writing the request that Sword remain out of the office until the morning of Thursday, July 5. (Lambert Dep. Ex. 10, Doc. No. 24-9.) Lambert's response referenced a telephone call that ended abruptly, and described the company's request that Sword remain out of the office until Thursday as a response to Sword's expression of "reluctance to work inside the building" on Monday: "[T]he company understands and is willing to offer you a couple days of paid leave ([Monday] and [Tuesday]) to give you some personal time." (Lambert Dep. Ex. 11, Doc. No. 24-10.)

Chris Baugher testified that he authorized Sword to take "personal time" off on Monday and Tuesday, July 2 and 3, 2007, only because Melissa Lambert "asked if he would be okay, and [he] said

yes." (C. Baugher Dep. 111:9–15.) According to Baugher, Lambert did not provide a reason; she simply asked if it would be "okay" if Sword took a couple of days off. (112:4–8.) He did not know whose idea it was for Sword to be off until Thursday, July 5.

Chris Baugher also testified that he noticed some time on Monday that Sword had removed personal items from her cubicle desk, which was right outside Baugher's office, and he believed he had mentioned this to Lambert. He did not attempt to contact Sword himself, allegedly because he "didn't know what she and Melissa [Lambert] had talked about." (C. Baugher Dep. 116:6–7.) He stated he did not feel it was "important" for him to call Sword and ask her why she had removed her personal belongings: "I mean, she can – they could be in her car, she could throw them away. Who knows?" (C. Baugher Dep. 116:16–19.) At the same time, he stated he found it to be unusual for someone to remove personal items from her desk unless she was quitting, resigning, or being terminated. He claimed that these two coincidences—that the company noticed Sword had removed personal items from her desk and that Patrick Lafferty reported she had been deleting emails from her inbox the same morning—made Baugher "uncomfortable" and led to the decision to again remove her access to the system on Monday shortly after she had left.

According to SET, Sword had no active customer appointments scheduled for Monday and Tuesday, July 2 and 3. According to Sword, she had scheduled cold calls to potential clients on both days, but she typically did not put cold calls on her Outlook calendar. She had to reschedule these appointments due to her unplanned and unsought two-day suspension.

It is undisputed that Sword remained out of the office July 2 and 3. July 4 was a holiday. Lambert and Sword had agreed to meet at 7:30 a.m. on Thursday, July 5, 2007, at SET's offices. According to SET, their contact that morning began with a phone call to Lambert from Sword, the first of many conversations and voicemails with or from Sword that SET recorded, unbeknownst to Sword. The audiotape of this conversation indicates Sword was calling from the building parking lot, asking repeatedly what was "going on" and why her access to her company voicemail and email remained cut off. She also repeated that she was not comfortable with the situation and asked Lambert repeatedly whether she was going to be permitted to work from home. Lambert told her she needed Sword to come in, and Sword told her she was "in front of the office right now . . . ready to go to work," but that she needed to leave to

attend a networking meeting.  (Doc. No. 22, Audio Recording Track 1.)  At Lambert's insistence, Sword agreed to come in and meet with Lambert, so Lambert went down to let her into the building.

The meeting between Lambert and Sword that morning was brief.  According to Lambert, she gave Sword a copy of the list of accounts Sword had complained about marked with Lambert's notes, and Lambert began trying to explain the fruits of her investigation so far into the assignment of the accounts.  Lambert testified that Sword was very agitated, was not paying close attention to what Lambert was saying, and at a certain point, Sword became upset and was yelling.  Lambert asked Sword what she was going to do next; Sword told her she had a morning networking meeting for which she was already late, and indicated she was going to leave.  Lambert asked her when she intended to return to the office, so she could let Baugher know.  Sword indicated she did not intend to return, and then left abruptly while Lambert was still trying to have a discussion with her.  (Lambert Dep. 141:16–25, 143:1–18.)

According to Sword, the only information Lambert had added to the list she had provided was the names of the sales representatives who used to be assigned to the various accounts, and Lambert did not provide any information as to why the accounts had been assigned to Danny Allen.  Sword was frustrated that Lambert was not providing her with any new information and was concerned that she was running late for a networking meeting.  Sword does not deny that she left the meeting with Lambert to attend that networking meeting, but denies that she left abruptly.  (Sword Dep. 167:14–168:20.)

Sword and Baugher spoke on the phone immediately after Sword left the meeting with Lambert.  In that conversation, which was also recorded, Baugher indicated Lambert had told him Sword had been there but had left, and he asked Sword, "What's going on?"  (Doc. No. 22, Audio Recording Track 8; Sword Dep. 221:5–7.)  Sword explained to him that she had to leave as she was running late for a meeting, and also related to Baugher that she was frustrated about having no access to emails or to her office voicemail, so her customers could not get in touch with her, and she could not update her Outlook calendar to schedule meetings or even access her calendar.  Sword related that this was "a problem, a big problem," and that she had conveyed to Lambert her discomfort being in the office in light of the communications issues:

> So I told her I'm not – with all this going on, I'm not comfortable being in the office.  I mean, they made it very, very difficult for me to be there right now.  So I told her I've got a laptop computer, I'll be able to carry out my assignments, but I would prefer working from my home office right now.

> I mean, they've made me uncomfortable and cut me off from everything. And then, you know, it's not a – I really don't understand to be honest with you. I'm totally clueless why all this is happening.

(Doc. No. 22, Audio Recording Track 8; Sword Dep. 222:12–21.) Baugher explained that the reason her access had been cut off was because everyone assumed she was "MIA" on Friday, June 29. Sword responded that she did not understand why no one had tried to call her to find out what was going on. She acknowledged that Jeanine Green had called her and left a message, but she had not wanted to get Green "involved" in what was going on, and Green was calling on a non-work-related matter anyway, so Sword had not felt comfortable calling her back. Otherwise, the only person who had called her on Friday was Lambert, and Sword had called Lambert back by the end of the day. In her conversation with Baugher, Sword also explained what her schedule was for the day, and the conversation ended with Baugher stating he would "touch base" with her later on. (Sword Dep. 226:2–3.) Baugher did not mention needing to meet with her to talk about job-performance issues or anything else, and he did not direct Sword to come into the office. Sword followed up that conversation with an email at 11:25 a.m., again expressing frustration with the lack of access to her email account and office phone, but stating that she would "attempt to do the best that [she] can to communicate with [Baugher] regarding her calendar." (Doc. No. 24-14, Baugher Dep. Ex. 4.) She outlined her plans for the rest of that day and the next day, and she also indicated she planned to continue working from her home office.

The relationship between Sword and SET only deteriorated further as the day progressed. Lambert testified that the "leadership team" at SET wanted Lambert "to continue to be the point of contact" with Sword, supposedly for the purpose of maintaining the relationship between Sword and Chris Baugher (Lambert Dep. 167:2–10), and despite the apparent difficulties Lambert and Sword were having in communicating. Neither Baugher nor anyone else ever conveyed that decision to Sword.

In any event, SET contends that after Sword left the office, Lambert proceeded to leave her several voicemails requesting that Sword call her back to finish the conversation begun in Lambert's office that morning and to meet with Chris Baugher. In the first message, Lambert simply asked Sword to return her call by 4:30 that afternoon because she "had a question" for her and wanted to find out when she wanted to finish going over the list of accounts. (Doc. No. 22, Audio Recording, Track 2; Sword Dep. 201:4–15.) Sword maintains that the date and time of that call is not firmly established, but the context

strongly suggests it occurred sometime Thursday morning after Sword had left for her networking meeting. In the next recorded message, Lambert states she is sorry to have missed Sword's call, which apparently came in just after Lambert went to lunch. Lambert repeated her request that Sword call her back sometime before 4:30 that afternoon. (Doc. No. 22, Audio Recording, Track 3; Sword Dep. 203:10–17.)

In the next recorded conversation, Lambert, who knows the conversation is being recorded, remains preternaturally calm while Sword becomes more agitated and audibly frustrated:

SPEAKER 1 [Lambert]:  – sales reps are supposed to be in at eight o'clock the morning –

SPEAKER 2 [Sword]:  That – that's not true.  That is absolutely not true, and everybody is not there every morning at 8:00 a.m.  So that's not true.  If you're going to make it difficult on me, then I just need to know that.  If that's what this is representing, then I just need to know that.  I need to be clear about that.

But I'm out here working, and I've already gotten like four phone calls from you guys this morning.  Everybody knows what I'm doing.  I've used my own email address, which I'm going to charge the company some internet expenses, because I have no access to any communications with any of my clients right now.  And that is extremely hard to do business that way.

SPEAKER 1:  Sure, and I –

SPEAKER 2:  So if there is some reason in particular that I need to be there, if there is a sales rep meeting in the office that I need to be at, then I'll be at the meeting.  Otherwise, if I'm just going to go in there to touch base with the office and come back, I've never been required to do that until now.

SPEAKER 1:  Okay.

SPEAKER 2:  So, I guess that's what I need to know.  I mean, what – what is it that you need me to be there for right now?

SPEAKER 1:  I am asking you to come in to touch base, since you haven't been in the office working –

SPEAKER 2:  I have been at the office.  I've been at the office Friday, and I was at the office this morning, okay?

SPEAKER 1:  Sure.

SPEAKER 2:  Yes, I was.

SPEAKER 1:  I need you to either come in this afternoon or sometime tomorrow.

SPEAKER 2:  I can't come in this afternoon, and I can't come in tomorrow.  And I just sent Chris [Baugher] an email to that effect, and I have not heard anything else other than that from him.

So I touched base with him and spoke to him this morning about what my plans were.  So if you need me to be in the office for a meeting or something, why don't you send me an email to my home address, okay?

SPEAKER 1:  Actually, I need you to decide one or the other.  I need you to come into the office either today or tomorrow morning.

SPEAKER 2:  I can't be there either day.  I've got appointments both days.  You all took all my appointments away earlier in the week, and I cannot do that.  I just don't have time to do that right now.

SPEAKER 1:  That's what I need you to do.

SPEAKER 2:  If you were a sales rep you would understand that –

SPEAKER 1:  Right now –

SPEAKER 2:  Okay.  I'll tell you what, you send me an email as to what you need me to do, okay?

SPEAKER 1:  I need you to tell me which one you're going to do, Suzanne.

SPEAKER 2:  Well, you send me an email, and I'll send you an email back.

SPEAKER 1:  No.  I need you to tell me right now which one you're going to do.

SPEAKER 2:  I'm not going to do that, okay?

SPEAKER 1:  If you don't feel comfortable –

SPEAKER 2:  Send me an email.  Thank you.  I'm going to hang up now, okay?  Bye bye.

SPEAKER 1:  Suzanne –

[Audio file ended.]

(Doc. No. 22, Audio Recording, Track 4; Sword Dep. 205:6–207:22.)  After Sword hung up, Lambert called her back and left a voice message asking Sword to call her back again, and reiterating her demand that Sword let her know if she would be in the office that afternoon or the next morning:  "We do need you to come in and touch base since you haven't been physically at work in the office since Friday morning . . . . If I don't hear back from you, I really have no choice than to assume that you're not coming back. . . . So if please call me back today . . . by 4:30 and let me know.  Thank you."  (Doc. No. 22, Audio Recording, Track 5; Sword Dep. 211:25–212:13.)

Sword called back and left a message for Lambert:

Hi, Melissa.  It's Suzanne Sword again. . . .  I hung up.  Because I'm not going to continue to banter with you and argue with you.  You all are mistreating me and you know that you are.  You're preventing me from working, and I'm trying to make the best of a horrible situation.  And this is all because I had a concern that I brought to somebody's attention, which I think is ridiculous.  The manner in which you're handling it is awful.

Anyway, but, as I explained to you and as I have sent an email to Chris already, I will not be in the office this afternoon, because I have appointments that I had to reschedule from Monday and Tuesday this week.  I've already sent him my plans for

tomorrow. And the first appointment is at eight a.m. in the morning, as he knows. And I have plans to go . . . to Cookeville to an advertising agency there that is looking for some phone systems. So I will be there and plan to spend my day there since I'm driving all the way out there tomorrow. And he's well aware of that, so that's not a big surprise to anyone, and I've also stated that to you as well.

I do have some vacation time that I would like to take, and I would like to take that next week. So, I have a medical procedure that I have to have done on Tuesday, so I will need to do that next week. And I will send an email to Chris . . . to that effect.

And anyway, just wanted to let you know what my plans were. Thank you for calling.

(Doc. No. 22, Audio Recording, Track 7; Sword Dep. 216:8–217:13.) Lambert returned the call and left yet another message, confirming that she had listened to Sword's message but reiterating, again, that she needed Sword to come into the office that afternoon or the next morning, and that if Sword did neither, then Lambert could only assume Sword would no longer be employed by the company: "If you do not come into the office this week, then I can only assume that you are not returning back to work, and you will no longer be employed with the company if you cannot come in and physically do your job onsite." (Doc. No. 22, Track 6; Sword Dep. 214:23–215:7.) Lambert also indicated that if Sword came in, she could discuss her vacation request with Baugher.

Lambert followed up her voicemail message with an email to Sword at 3:38 p.m. on Thursday stating: "I need for you to let me know by 4:30 PM today whether you will be in the office this afternoon, or 8:00 tomorrow morning." (Doc. No. 24-16, Lambert Dep. Ex. 16.[4]) Sword reacted by sending an email to Chris Baugher at 3:54 p.m., copying Lambert, stating:

Chris,

I will need to take a few vacation days next week, as I am having an exploratory medical procedure done on Tuesday, July 10th and need to prep for the procedure on Monday, July 9, 2007. I will return working from my home beginning on Thursday, July 12th, depending on the findings.

I sent you an email message this morning regarding my schedule for the next couple of days. Melissa Lambert in the Human Resources Department would like for me to come into the office either this afternoon, which I cannot accom[m]odate or tomorrow sometime, which I will also be unable to do, as I will be in Cookeville tomorrow, per my message of this morning. She has harassed me today with repeated phone calls via my cell phone and I have continued to return the calls. My most recent phone call from her stated that if I do not come into the office today, which I have already done at 7:45 a.m. this morning[,] or tomorrow, then she will consider me to be a no show for work and will terminate my employment with Southeastern Telecom. I have made it very clear that I am not comfortable at the office at this time due to the retaliation (direct dial phone being

_____

[4] The exhibit number is handwritten and unclear. It is either exhibit 16 or exhibit 10 to Lambert's deposition.

cut off, access to the office being terminated and access to my business email being denied.)  As I have continued my calendar of business appointments today under some very difficult circumstances, I do expect to be treated with respect and professionalism.

I will look forward to hearing from you.

Suzanne

(Doc. No. Baugher Dep. Ex. 5.)  She sent a second email to Baugher at 4:38 p.m. enclosing her "30/60/90 Day funnel to the best of [her] knowledge."  (Doc. No. 24-18, Baugher Dep. Ex. 6.)

According to her deposition testimony, Sword also emailed Lambert at 4:22 p.m., stating she would not be in the office either later that evening or at 8:00 the next morning because she already had scheduled appointments at those times.  (Sword Dep. 188:6-10.)  Sword claims she understood that Lambert had threatened to fire her if she did not come into the office, but maintains that she did not believe Lambert had direct authority over her, and Sword continued to tell Lambert that if Baugher needed her to come into the office, she would do so.  (Sword Dep. 186–88.)

Lambert and Baugher apparently did not actually speak together about Sword, or about Baugher's purported need to bring Sword into the office to talk with her about job performance or anything else, until after Baugher received Sword's email of 3:54 p.m. that day.  (C. Baugher Dep. 132:1–13.)  At 5:55 p.m., Baugher sent Sword an email to her personal account.  That email is not in the Court's record, but based on Sword's deposition testimony, the email confirmed that Sword's position "require[d] her to be able to work inside the office," that Baugher "needed" Sword to come into the office to meet with him at some point on Friday, even if it is not first thing in the morning, and asked her to let him know, after she received the message, what time on Friday she would be in.  (Sword Dep. 188:13–21.)  Sword testified that she did not open this email until Friday afternoon, after she was terminated.  (Sword Dep. 188:22–189:13)  Baugher, however, also followed up his email with a voice message the next morning asking Sword to let him know what time she would be there that day.  It did not reiterate his email or express any urgency, but did indicate an email had been sent late the previous day, and that he expected to meet with her that Friday.  (Doc. No. 22, Audio Recording Track 9; Sword Dep. 236.)

Sword responded to that message by calling Baugher back and stating that she had no plans to be in the office that day:

Hey Chris, it's Suzanne Sword.  It is, let me look and see, 12:00 noon on Friday.  Just wanted to let you know I finished my appointments this morning.  I am headed to

> Cookeville. I think I sent you an email to that regard. I'm going to meet with Frye Advertising there, and there is another appointment that's possible via Frye Advertising. He was trying to set it up for me. Anyway, and if I can get to that one as well while I'm there, I'm going to do that.
>
> Anyway, just wanted to let you know I will – I have absolutely no plans to come way back that direction today, because by the time I get home from Cookeville it'll probably be about 5:00, and I'm not going to drive into town at 5:00 this evening. But if there's anything you have a question about, please feel free to call me, and I will try to get back to you.
>
> But I sent my funnel to you yesterday, and I believe we've talked about most of them. But if there is any questions about anything that I'm doing, just please let me know.
>
> I'll talk to you later. Have a great day! Bye bye.

(Doc. No. 22, Audio Recording Track 10; Sword Dep. 238:8–239:2.) Sword concedes, for purposes of the defendant's motion for summary judgment, that her appointment at 8:00 a.m. in Nashville took only an hour, and her appointment in Cookeville was not actually scheduled until 1:00, so she would have had time to stop by SET's offices in Nashville on her way to Cookeville. She also claims that if Baugher had told her to cancel her appointments and come into the office, she could have come in that afternoon as well.

However, in response to her voicemail, rather than speaking directly with her or giving her an ultimatum, Baugher called Sword back and terminated her employment in a voicemail message left shortly after noon:

> Hey Suzanne, this is Chris Baugher. I got your voicemail message earlier saying you were heading to Cookeville this afternoon, and that you had no intention of coming into the office. So at this point we are ending your employment with Southeastern Telecom due to insubordination. It's clearly not working out.
>
> So, anyway, I wanted to touch base with you and see if we could schedule a time to meet. It doesn't have to be inside the office. It could be outside the office. But I just want to schedule a time to meet so that we can just fill out the necessary paperwork, you know, your exit paperwork, and that I can get your laptop and the customer files that you may have and any other company property that you may have. So please just give me call when you have a chance.

(Sword Dep. 243:11–244:2.) Sword returned his call and left a message confirming that she had received his.

SET maintains that Sword's termination was justified on the grounds of her insubordination. Sword denies that she was insubordinate and claims she did not understand Baugher's request that she come into the office as a direct order or ultimatum.

This lawsuit, brought by the EEOC on behalf of Sword, followed Sword's termination and exhaustion of her administrative remedies.

## III.   ANALYSIS AND DISCUSSION

### A.   Elements of Retaliation Claim under Title VII and the FLSA

Title VII protects employees from retaliation for having opposed an employer's unlawful actions. 42 U.S.C. § 2000e-3(a).  In an indirect-evidence case, such as the one presented here, the familiar burden-shifting *McDonnell Douglas* analysis applies, the steps of which the Sixth Circuit has articulated as follows:

> (1) the plaintiff must establish a *prima facie* case of [retaliation]; (2) the employer must articulate some legitimate, nondiscriminatory reason for its actions; and (3) the plaintiff must prove that the stated reason was in fact pretextual.

*Hollins v. Atl. Co.*, 188 F.3d 652, 658 (6th Cir. 1999) (quoting *Harrison v. Metro. Gov't of Nashville*, 80 F.3d 1107, 1115 (6th Cir. 1996)).

As the first element of her *prima facie* case of retaliation, a plaintiff must demonstrate that she engaged in activity protected by Title VII.  An employee engages in opposing activity, or protected activity, when she voices a complaint about the employer's unlawful practices.  *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579–80 (6th Cir. 2000).  As a threshold matter, however, the plaintiff "must demonstrate that her opposition was reasonable and based on a good-faith belief that the employer was acting in violation of Title VII."  *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516 (6th Cir. 2009) (citing *Johnson*, 215 F.3d at 579).

Once that hurdle is cleared, the plaintiff must also show that the defendant knew of her exercise of her protected rights; that the defendant subsequently took a materially adverse action against the plaintiff or subjected the plaintiff to severe or pervasive retaliatory harassment; and that there was a causal connection between the plaintiff's protected activity and the adverse employment action.  *Id.*; *Allen v. Mich. Dep't of Corr.*, 165 F.3d 405, 413 (6th Cir. 1999).  In determining whether there is a causal relationship between a plaintiff's protected activity and an allegedly retaliatory act, courts may consider whether the employer treated the plaintiff differently from similarly situated individuals and whether there is a temporal connection between the protected activity and the retaliatory action.  *Allen*, 165 F.3d at 413.

Once the plaintiff has established a *prima facie* case, the burden of production of evidence shifts

to the employer to "articulate some legitimate, nondiscriminatory reason for its actions." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The plaintiff, who bears the burden of persuasion throughout the entire process, must then demonstrate "that the proffered reason was not the true reason for the employment decision." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 793 (6th Cir. 2000).

The Fair Labor Standards Act, 29 U.S.C. § 215(a)(3), also prohibits retaliation, and it appears that retaliation claims under the FLSA are analyzed identically to retaliation claims under Title VII. *See, e.g., Jamilik v. Yale Univ.*, 362 F. App'x 148, 151 (2d Cir. 2009) (presuming identity between Title VII and FLSA retaliation claims and applying *McDonnell-Douglas* burden-shifting analysis to both); *Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617 (5th Cir. 2008) (expressly applying same analysis to Title VII and FLSA retaliation claims); *Denman v. Youngstown State University*, 545 F. Supp. 2d 671, 678 (N.D. Ohio 2008) (applying Title VII analysis to FLSA and Equal Pay Act retaliation claim). Thus, if the defendant is entitled to summary judgment on Sword's Title VII retaliation claim, it will also be entitled to judgment in its favor on the FLSA claim, based on an a complaint of discrimination under the Equal Pay Act.

### C.    Defendant's Motion for Summary Judgment

SET has now filed its motion for summary judgment in which it asserts that it is entitled to judgment in its favor as a matter of law because: (1) Sword did not have a "reasonable belief" that Title VII or the Equal Pay Act had been violated; (2) the only "adverse employment action" she suffered that is sufficient to support a retaliation claim was her termination; (3) Sword cannot establish a causal connection between her engaging in protected activity and her termination or any other purportedly adverse action; and (4) Sword cannot establish that the legitimate, non-discriminatory reasons advanced by SET for her termination and other adverse actions are pretextual. The Court will address each of these arguments in turn.

### 1.    Sword's "Reasonable Belief" that the Law Had Been Violated

As the plaintiff points out, SET essentially argues that because sales representative Danny Allen was so much more experienced and qualified than Sword, Sword could not reasonably have believed the accounts from departing sales representatives should have been allocated equally between Allen and her. While it may indeed be the case that SET had "every right," as it argues, to assign more accounts to

Allen based on his previous experience and network expertise, that argument does not attack the credibility of Sword's claim that she believed the distribution of accounts was discriminatory. Sword has also presented evidence that she was a particularly good at bringing in new business, regardless of her lack of network expertise, and that she was considered experienced enough for the assignment of several very large accounts. In addition, while Sword also mentioned to SET's management that she felt SET was like a "good ol' boys' club," that broader complaint about the management of the company does not negate the fact that her initial complaint was based on her belief that the disproportionate distribution of accounts to Allen was discriminatory based upon his gender. Moreover, she has not brought suit here for discrimination *per se*, but only for retaliation based on the company's response to her complaint of discrimination.

Sword may have been wrong in her belief that the company's distribution of accounts was discriminatory, and in fact, her decision not to pursue a discrimination claim implies her recognition that the available evidence is insufficient to support a discrimination claim. Regardless, there is simply no evidence in the record that her belief that she was subject to discrimination was not held in good faith. As long as a complaint is made in good faith, "it is irrelevant whether the allegations are ultimately determined to have violated Title VII." *Johnson*, 215 F.3d at 580. SET's motion for summary judgment on this ground is without merit.

### 2. Whether Sword Suffered Adverse Employment Actions apart from Termination

The Supreme Court has made it clear that the scope of Title VII's retaliation provision is broader than that of Title VII's discrimination provision. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). Specifically, the "adverse employment action" requirement in the retaliation context is not limited to an employer's actions that affect the terms, conditions, or status of employment, or to acts that occur in the workplace. Instead, the retaliation provision protects employees from conduct that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (citation and internal quotation marks omitted).

The actions regarding which Sword's retaliation complaint is based are that SET disabled her key fob so that she could not enter the building; disabled her access to her work voicemail, changed the password on her work email account so that she could not access her work email and, after Sword

expressed her discomfort over the fact that these events had occurred and requested permission to work from home until the issues were resolved, SET suspended her with pay for two days rather than permitting her to work from home. According to SET, removal of Sword's access to her email account and to the building did not occur until late in the day on Friday, June 29, 2007, and Sword did not become aware of those actions until Monday morning. SET further maintains that none of its actions harmed Sword, because she had no appointments scheduled over the weekend or on Monday and Tuesday, July 2 and 3. As a result, according to SET, these actions do not constitute materially adverse actions for purposes of establishing a retaliation claim.

The Court disagrees. A reasonable jury could find, as Sword clearly did, that these actions were highly irregular, unnecessary, and even threatening in light of their proximity to Sword's formal written report of perceived discrimination. Although Sword did not suffer a direct loss of pay[5] as a result of being placed on leave, even Melissa Lambert recognized that Sword would be upset to learn that her access to email, voicemail and the building had been cut off. Further, although SET maintains that Sword's email access was reinstated briefly on Monday morning, July 2, Sword alleges that she was never again able to access her work email or voicemail after Friday, June 29, 2007. Perhaps most damningly, SET never made an effort adequately to explain its actions or to assuage Sword's concerns when she repeatedly voiced her discomfort about and confusing regarding why SET had taken these actions immediately on the heels of her making a complaint of discrimination. In short, there is at least a factual dispute as to whether these actions constituted actions of the type that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S.at 68.

### 3. *Whether Sword Can Establish a Causal Connection between her Protected Activity and the Materially Adverse Employment Actions*

In its motion, SET concedes that termination of Sword's employment constitutes a materially adverse action sufficient to support a retaliation claim. SET argues, however, that Sword cannot establish the requisite causal link between her having engaged in protected activity and her termination, and that the temporal proximity of one week between the one and the other is not sufficient, standing

---

[5] Because at least part of Sword's pay was based on commissions, her inability to work for two days could have indirectly affected her income stream from commissions, but Sword has not presented any evidence in that regard.

alone, to give rise to an inference of causation. Again, the Court disagrees and finds that the record supports an inference of causation, particularly when SET's other conduct is factored into the equation.

To establish a causal connection sufficient to defeat summary judgment, an employee must "proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action[s]." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009) (citations and internal quotation marks omitted). The burden of proof at the prima facie stage is "minimal"; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the protected activity and the retaliatory action. *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir.1997).

Generally speaking, temporal proximity alone will not be considered sufficient to create an inference of causation, but it is one factor that may be considered along with other evidence of retaliatory conduct. *Spengler v. Worthington Cylinders*, 615 F.3d 481, 494 (6th Cir. 2010). The Sixth Circuit has recognized, however, that "in some cases temporal proximity may be sufficient to establish causation." *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009) (citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523–26 (6th Cir. 2008)). In *Mickey*, the court held that "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation." *Id.* at 525 (holding that the court could infer a causal connection in that case where the plaintiff was fired the same day he engaged in protected activity, even if he had not presented any other evidence of retaliation); *see also McNett v. Hardin Cmty. Fed. Credit Union*, 118 F. App'x 960, 965 (6th Cir. 2004) (finding causation when "only 13 days" separated the protected activity from the adverse action); *Shefferly v. Health Alliance Plan of Mich.*, 94 F. App'x 275, 285 (6th Cir. 2004) ("[T]he passage of less than three weeks between [the employer's] receipt of the charges and the adverse actions gives rise to an inference of discrimination[.]"); *DiCarlo v. Potter*, 358 F.3d 408, 421–22 (6th Cir. 2004) (holding that the passage of only twenty-one days between the plaintiff's filing of an EEOC charge and his termination gave rise to an inference of a causal connection between the two events sufficient to establish a *prima facie* case of retaliation).

In the present case, the temporal proximity between Sword's having engaged in protected activity

and her termination, along with the other events leading up to her termination, is acutely close. Sword spoke with her supervisor early on Friday morning, June 29, 2007, handing him a written letter outlining her belief that she was being discriminated against on the basis of her gender. Her supervisor immediately referred her complaint to the human resources manager. That very day, SET made the decision to eliminate Sword's access to email and voicemail, and deactivated her key fob that permitted her entry into the building after hours. On Monday morning, when Sword learned about and expressed discomfort with those actions, SET insisted she take two days paid leave rather than allowing her to work from home until the issues were addressed. When she returned to the office Thursday morning, these issues were still unresolved, and no one, least of all her supervisor or the human resources manager, made a real effort to dispel Sword's discomfort or to explain to her what was going on. Sword's employment was terminated on Friday, July 6, via voicemail left on her cell phone. The fact that all these events all occurred within a week of Sword's having engaged in protected activity is, under the specific circumstances presented here, sufficient to give rise to an inference of a causal connection between Sword's complaint of discrimination and the adverse actions of which she complains, including but not limited to her termination.

### 4. Whether SET's Proffered Reasons for its Actions Are Pretextual

SET claims that in removing Sword's remote access to its computer network, building and phone system, SET was acting legitimately to protect its intellectual property and its customers, based on Sword's having, without explanation, missed a client meeting, removed files and personal belongings from her desk, and failed to respond to "repeated phone calls" from SET's human resources manager as well as from Jeanine Green, a sales engineer. SET claims that it made the decision to take these actions at the end of the day on Friday, June 29 when Sword had not checked in all day, that taking these steps was "a common practice in the sales industry," and that SET had previously experienced problems with former sales representatives using information to contact its customers. SET also maintains that it restored Sword's computer access first thing Monday morning, July 2, but that it was continuing to protect its intellectual and proprietary information when it elected to remove that access again upon receiving information that Sword was deleting emails "wholesale." SET also asserts, regarding Swords' two days' paid leave, that it was concerned about Sword's behavior and elected to give her time to "calm down."

(Lambert Dep. 95–96; Baugher Decl. ¶ 5.)  Finally, SET asserts that its decision to terminate Sword for insubordination was "clearly justified," given that Sword defied a direct order from the human resources manager and from her own direct supervisor.

Thus, SET has offered non-retaliatory reasons for its actions.  As a result, the burden shifts back to the plaintiff to show that the reasons put forth by the defendant are pretextual, "which can be done by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct."  *Clay v. United Parcel Serv.*, 501 F.3d 695, 704 (6th Cir. 2007) (citations and internal quotation marks omitted).  The question is whether the "employer reasonably relied on the particularized facts then before it," and the Sixth Circuit has instructed that, in analyzing that issue, courts should "not require that the decisional process used by the employer be optimal or that it left no stone unturned.  Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action."  *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998).  As the court further explained:

> Although courts should resist attempting to micro-manage the process used by employers in making their employment decisions, neither should they blindly assume that an employer's description of its reasons is honest.  When the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process "unworthy of credence," then any reliance placed by the employer in such a process cannot be said to be honestly held.

*Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).  "In challenging an employer's action, an employee 'must demonstrate that the employer's reasons (*each of them*, if the reasons independently caused [the] employer to take the action it did) are not true.'"  *Id.* at 806 (quoting *Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672, 676 (7th Cir. 1997) (emphasis added by Sixth Circuit)).

In the present case, Sword argues that the defendant's proffered reasons are unworthy of credence.  First, she points out that there was no legitimate basis for SET's alleged fear that Sword would compromise its intellectual property, upon which its decision to remove Sword's access to voicemail and email and to deactivate her key fob on Friday, June 29 was premised.  SET had never before taken these actions against an active employee—it had only taken such steps on previous occasions after the employee's employment had already been terminated.  SET argues that Sword took files off her desk and

missed an appointment, which justified the decision. The evidence regarding what items Sword took off her cubicle desk is vague at best, and SET has not presented evidence that it was unusual for Sword to take active files with her when she went out to meetings or to make cold calls. Moreover, Baugher apparently did not believe the missed meeting was important enough to warrant a telephone call to Sword—in fact, no one contacted or attempted to contact her that day to advise her she had missed a scheduled meeting.

With regard to SET's allegations that Sword was not returning phone calls on Friday, June 29, the only two people alleged to have tried to call her from the office are Jeanine Green and Melissa Lambert. Sword, in fact, returned Lambert's call at the end of the day. She did not return Green's call, but has presented unrebutted evidence that Green's phone call was not work-related. Moreover, Green was not her supervisor or in a management position at all at the company.

There are also factual discrepancies from SET's witnesses as to who made the decision to limit Sword's access to SET's computer network. Lambert claims she first conferred with Baugher before making that decision. Baugher denied any involvement in that decision at all. (C. Baugher Dep. 80: 8–11 ("Q. [W]ithout any input from you, Melissa Lambert independently cut off Suzanne Sword's computer access. Is that your testimony? A. Yes.").) Lambert and Larry Baugher claimed that the decision to cut off Sword's network access was based on their past experience with another former employee, Scott Lattimore, who misused company information. Lattimore had left the company only two weeks before the incidents giving rise to this lawsuit, but it appears from information in the record that SET did not become aware of Lattimore's alleged misuse of confidential information until the fall of 2007, such that his actions could not possibly have motivated SET's treatment of Sword.

With respect to SET's allegation that Sword was engaged in the "wholesale deletion" of emails from her inbox on Monday morning, July 2, which purportedly motivated the decision to cut off her access to email a second time, there is a factual dispute as to the veracity of that statement as well. According to Sword, she never again had access to her work email once she was cut off from it on Friday, June 29. SET's employees' testimony regarding how Sword's email access would have been reinstated is very vague and does not establish that such access was actually reinstated. Further, none of SET's witnesses has provided evidence regarding how many emails were supposedly deleted, when, or what they were

about. There is also evidence in the record that deletion of emails was common and usual practice, and no one ever raised the issue with Sword or questioned her about it, further underscoring the irrelevance of the incidence, if it in fact ever occurred.

On Monday, July 2, the work day following Sword's giving her manager a written complaint of sex discrimination, Sword was given two day's paid leave, purportedly because she was "upset" and wanted to work from home rather than from the office. Again, this decision appears to have been made unilaterally by Lambert: Sword testified that she requested permission to work from home, but Lambert stated she simply asked Chris Baugher instead whether she could give Sword two days' unpaid leave. She claims she did not ask Baugher whether Sword could work from home, and Baugher simply ratified her request to give Sword two days' leave. Sword, for her part, denies being upset; rather, she was concerned about having had her access to her company email and voicemail removed, and the deactivation of her key fob. From her perspective, the company had reacted strangely and threateningly to her report of sex discrimination. The Court agrees that SET had no basis for believing that Sword was doing anything other than her job when she was not in the office. The company never offered any explanation for its actions; rather, its actions seemed calculated to escalate rather than to alleviate Sword's concerns.

Finally, with respect to the decision to terminate Sword's employment, SET claims that Sword's refusal to return to the office on Friday, July 6, 2007 constituted blatant insubordination which justified her termination. In actuality, Sword never received an unambiguous directive from Baugher that she cancel appointments and return to the office to meet with him. Rather, the two exchanged a series of emails and voicemails, none of which conveyed urgency, throughout Thursday afternoon and Friday morning. Although Sword's claim that she did not receive Baugher's email of Thursday evening, July 6, until after she had already been terminated on July 7 defies credibility, it is for a jury to make the determination of whether the statement is true. Moreover, the fact that Baugher fired her via voicemail, without ever giving her an ultimatum directly or a chance to explain herself, purportedly for insubordination, also defies credibility.

In sum, the Court finds under the specific circumstances presented here that a jury question is presented as to whether each of SET's proffered legitimate, nondiscriminatory reasons for its actions has

a basis in fact, actually motivated its conduct, or was sufficient to warrant the actions taken.  In particular, there is a question as to whether SET "made a reasonably informed and considered decision" before taking any of the challenged actions against Sword, from cutting off her access to email to terminating her employment.

IV.    **CONCLUSION**

In a word, the facts so far developed in this case are inconclusive.  They do not add up, no matter whose version of events, if either, is to be believed.  Alongside the inconsistencies, however, a couple of things are clear, and these are that the human resources manager, Melissa Lambert, was either completely overstepping the bounds of her job during the events in question or is now going out of her way to protect her employer, while Sword's supervisor Chris Baugher either was substantially abdicating his responsibilities or is now minimizing his involvement in the decisions being made during the relevant time frame.  Regardless, the facts viewed in the light most favorable to Sword as the non-moving party are sufficient to permit a reasonable jury to find that she has proved each element of her *prima facie* case of retaliation, and that the defendant's proffered reasons for its actions are pretextual.

SET's motion for summary judgment will therefore be denied.  This matter remains scheduled for trial to begin March 15, 2011.  An appropriate Order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge